COMMONWEALTH *VS.* JOANNE M. SANTOS.

No. 02-P-206.

Franklin. April 14, 2003. - August 1, 2003.

Present: LAURENCE, McHUGH, & COHEN, JJ.

*Trespass. Statute,* Construction.

At the trial of a complaint alleging criminal trespass by agency, the judge erred in denying the defendant's motion for a required finding of not guilty, where the Commonwealth presented no evidence that the defendant's agent had ever received the requisite notice that he was forbidden to enter or remain in or on the property in question, and where the defendant herself did not physically enter or remain in or on the property in question; moreover, no trespass under G. L. c. 266, § 120, occurred where the "entry" consisted of the purported invasion of airspace by briefly and harmlessly moving or propelling an object above the property in question. [704-710]

COMPLAINT received and sworn to in the Greenfield Division of the District Court Department on May 3, 2001.

The case was heard by *W. Michael Ryan,* J.

*Cynthia M. Pepyne,* Assistant District Attorney, for the Commonwealth.

*Timothy M. Farris* for the defendant.

LAURENCE, J. After a bench trial on the charge of criminal trespass (G. L. c. 266, § 120) in Franklin District Court, the defendant, Joanne Santos, was convicted of "trespass by agency."[1] She contends that the trial judge erred (1) in finding that the mechanical hoisting of cement blocks above, but never

---

[1]The defendant initially was charged with trespass, malicious destruction of property and the filing of a false police report relating to a supposed trespass over her land by complainant Joseph Schady (see *infra*). Before trial, the malicious destruction of property charge, based on damage she allegedly inflicted on the interior of a police cruiser after her arrest, was dismissed at the request of the Commonwealth. The defendant ultimately was found not guilty on the charge of filing a false police report.

touching, her neighbors' driveway (which bisected her property) constituted a criminal trespass; and (2) in finding her guilty of trespass by reason of the actions taken by the crane operator whom she had hired to move the cement blocks. Finding no basis upon which the defendant's conviction may stand, we reverse.

*Background.* The events giving rise to the defendant's conviction reflect the depressingly familiar phenomenon of an ongoing, rancorous dispute between neighbors over asserted property rights. In 2001, Karen and Joseph Schady owned 78 River Street, Bernardston, a residential property abutting the rear of the defendant's property, which was located at 84 River Street. The Schadys' paved driveway leading from their property to the main access road, River Street, was flanked on either side by land owned by the defendant. A heated dispute existed between the Schadys and the defendant over the extent of the driveway owned by the Schadys.[2] A piece of city-owned property (the "buffer zone," estimated to be from twelve to twenty-five feet wide) sat between River Street and the end of the driveway (as well as the defendant's land).

The defendant owned and ran a seasonal farm stand on her River Street property. The fixtures associated with this business, a ten-foot gazebo and flower beds, were located on her property but alongside the driveway. Concerned about the defendant's customers' foot and automobile traffic across the driveway, the Schadys, through their attorney, requested that the defendant prevent her customers from using their claimed driveway in any manner. Subsequently, on March 23, 2001, the defendant was served with a "no trespassing" notice, pursuant to G. L. c. 266, § 120. The notice stated: "You are hereby notified that you, your tenants, your guests, your employees, your invitees and anyone under your direction are prohibited from entering or remaining upon the land or building owned and occupied by

---

[2]At the time of the alleged trespass and continuing through the criminal trial, litigation between the defendant and the Schadys over the ownership of the driveway was pending in Superior Court. The Schadys claimed the entire width of the driveway, approximately eighteen feet. Although they were in possession of the entire driveway, the defendant claimed that the Schadys were deeded only ten of its eighteen foot width, and that she owned the remainder.

[the Schadys]. . . . This notice is intended to include [the Schadys'] driveway."

On May 2, 2001, the date of the alleged trespass, the defendant had contracted with a crane operator to move several three by five foot rectangular cement blocks from a field on her property and to place them on the northerly and southerly edges of her land bordering the driveway — where they previously had been located before the Schadys moved them — in such a way as to prevent her customers from entering the driveway. The defendant orally informed the crane operator that, because she was involved in a boundary dispute with the Schadys over the extent of their portion of the driveway, he was to avoid entering or touching in any way the ten-foot wide portion of the driveway she conceded was their property, to be sure to place the cement blocks entirely on what she claimed to be her property, and to keep the crane equipment in the buffer zone at all times. She did not show or tell the operator of the no trespassing notice. The crane operator proceeded to transfer the blocks from the defendant's field by hoisting them into the air, maneuvering them over the driveway when necessary, and placing them alongside the driveway but on the defendant's claimed property.[3] Efficient crane operation required that the boom of the crane at times had to swing across the airspace above the driveway (at some unspecified height) when placing a cement block on the other side.

While these cement blocks were being relocated, Karen Schady (who had observed the work as she was leaving to do errands) told the crane operator that "there was a land dispute going on." She then attempted to "show" him (in some fashion not described in her testimony) the no trespassing notice, but he "didn't look at it" as he continued moving the blocks even

[3]The Commonwealth concedes that, because of the bona fide legal dispute over the width of the portion of the driveway owned by the Schadys (see note 2, *supra*), the defendant could not be found guilty on the theory that the blocks were placed on the Schadys' property (as they had initially complained). The Commonwealth could not, therefore, establish beyond a reasonable doubt that the land physically touched by the crane equipment and blocks was in fact that "of another" (see *infra*) rather than that of the defendant. Consequently, it relies entirely on the theory of trespass by agency, by virtue of the crane mechanism's occasional "invasion" of the airspace over the Schadys' undisputed portion of the driveway.

though Karen Schady continued to claim that the blocks were being laid on her property. Nothing in the record indicates that any persons other than the defendant, the crane operator, and Karen Schady were present at the scene or that the crane operations posed any risk or danger to anyone or caused any damage to any property.

On May 3, 2001, the defendant was arraigned, on the Schadys' complaint, on the charge of trespass. For reasons exciting our dubiety (see *infra*), the case proceeded to trial. Citing no authority, the judge denied the defendant's motions for a required finding of not guilty and found her guilty of criminal trespass by agency by virtue of the crane operator's occasional intrusions into the airspace above the driveway. The judge stated, "[she] order[ed] people to use that crane to go over the [Schadys'] property, even if it didn't touch, no matter where the [crane] was parked. . . . I'll merit the argument of agency." Prior to the defendant's sentencing to one year's probation, she was unaccountably held without bail for four days in a house of correction (a questionable incarceration not, however, challenged on appeal) and ordered to undergo a psychiatric evaluation.

*Discussion.* The pertinent language of the criminal trespass statute states:

> "Whoever, without right enters or remains in or upon the dwelling house, buildings, boats or improved or enclosed land, wharf, or pier of another, or . . . a school bus . . . after having been forbidden so to do by the person who has lawful control of said premises, whether directly or by notice posted thereon, or in violation of a court order . . . shall be punished by a fine of not more than one hundred dollars or by imprisonment for not more than thirty days or both such fine and imprisonment."

G. L. c. 266, § 120, as amended through St. 1999, c. 102.

It is clear from the record and from this plain statutory language that the judge should have allowed the defendant's motions for a required finding. No evidence was presented that the crane operator himself had ever been "forbidden" to "enter or remain in or upon" the Schadys' driveway, either directly or

by any notice posted thereon (there was none). Assuming an ambiguity or imprecision in the statute as applied to these facts — i.e., whether Karen Schady's unlimned effort to "show" the no-trespassing notice to the crane operator could be deemed the equivalent of "directly forbidding" him to move any part of his equipment or the blocks he was manipulating into the airspace over the disputed driveway — we must construe it strictly against the Commonwealth and in favor of the defendant. See *Commonwealth* v. *Clinton,* 374 Mass. 719, 721 (1978); *Young-worth* v. *Commonwealth,* 436 Mass. 608, 611-612 (2002).

The requisite notice cannot, accordingly, be deemed to have been given to the operator. Nor can notice to him be implied under this canon simply because it was previously given to the defendant. The operator cannot, therefore, be held to have committed a trespass forbidden by statute. See *Commonwealth* v. *Gagnon,* 387 Mass. 567, 569, *S.C.,* 387 Mass. 768 (1982), cert. denied, 461 U.S. 921 and 464 U.S. 815 (1983) (any reasonable doubt as to the meaning of a criminal statute must be resolved in favor of a defendant and against the finding of a criminal violation).

"[T]he mere fact of agency is not enough to impose criminal liability on the master." *Commonwealth* v. *Beneficial Fin. Co.,* 360 Mass. 188, 263 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts,* 407 U.S. 910, and sub nom. *Beneficial Fin. Co.* v. *Massachusetts,* 407 U.S. 914 (1972). Before a principal can be held criminally responsible, "the servant's criminal act must be shown." *Id.* at 262. As noted above, the agent here cannot be held to have violated the trespass statute. Criminal liability may not, therefore, be vicariously imposed on the defendant who, the evidence clearly showed, did not herself physically enter or remain in or upon the Schadys' conceded portion of the driveway and who (as the discussion, *infra,* demonstrates) could not be deemed to have committed a trespass under the statute herself in any event. Cf. Restatement (Second) of Torts § 158(a) comment j (1965) ("If, by any act of his, the actor intentionally causes a third person . . . to enter land in the possession of another, the actor is responsible for the third person's entry *if it be a trespass*" [emphasis added]); Restatement (Second) of Agency § 212 comment b (1958) ("If a person directs a

particular act which is performed as directed, he is subject to liability *if the act directed constitutes a tort*" [emphasis added]).[4]

The defendant's conviction is even more fundamentally flawed, however, because no trespass under the statute can be said to have occurred. The Commonwealth has been unable to cite a single case, from Massachusetts or any other jurisdiction, supporting the proposition that criminal trespass can be founded on an "entry" consisting of the purported invasion of airspace by briefly and harmlessly moving or propelling an object above a parcel of land. Compare *Commonwealth* v. *Davis*, 10 Mass. App. Ct. 190, 193-195 (1980) (the lack of any reported decision, over the many decades since the Legislature enacted the "assault and battery by means of a dangerous weapon" statute, that "stretched" the definition of the term "weapon" to include parts of the human body, such as teeth, indicated that no such broadening of the statutory crime ever was contemplated).

Moreover, the undefined word "enter" as used in the statute must be given its usual meaning as commonly understood, see *Commonwealth* v. *Campbell*, 415 Mass. 697, 700 (1993), a meaning that presupposes actual, physical presence in or on property. See The American Heritage Dictionary of the English Language 614 (3d ed. 1992) ("enter . . . 1. To come or go into: *The train entered the tunnel.* 2. To penetrate, pierce: *The bullet entered the victim's skull*" [italics original]). Cf. *id.* at 1908 ("trespass . . . To commit an unlawful injury to the . . . property . . . of another . . . especially to enter onto another's land wrongfully"). Additional assistance in deriving the intended meaning comes from the term's use in other legal contexts. *Commonwealth* v. *Campbell, supra.* See *Commonwealth* v. *Dunn*, 43 Mass. App. Ct. 58, 60 (1997), quoting from Black's Law Dictionary 533 (6th ed. 1990) ("[T]he [undefined] word ['enters,' as used in the home invasion statute, G. L. c. 265, § 18C,] is to be construed as an unlawful entry, consistent with its use in a criminal context," which contemplates entry "into . . . [property] for the purpose of committing a crime therein").

---

[4] We need not address the issue of the application of G. L. c. 266, § 120, to a principal who intentionally directs an agent to enter or remain in or upon land known or acknowledged by the principal to belong to another, which is not the case here presented.

Against this background, we find it implausible that the average citizen would understand that the type of "entry" that G. L. c. 266, § 120, prohibits extends to the unusual, technical circumstance of momentarily conveying an object through airspace over someone's property without causing the slightest harm to that property or any interference with or danger to anyone's use of the property. See *Commonwealth* v. *Triplett*, 426 Mass. 26, 29 (1997), quoting from *Commonwealth* v. *Twitchell*, 416 Mass. 114, 123 (1993) (as a matter of constitutional law, "both statutory and common law crimes must 'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited' "); *Commonwealth* v. *Quinn*, 439 Mass. 492, 499 (2003), quoting from *Commonwealth* v. *Sefranka*, 382 Mass. 108, 110 (1980) ("An essential principle of due process is that a statute may not proscribe conduct 'in terms so vague that [persons] of common intelligence must necessarily guess at its meaning.' . . . [Such a] statute offends due process because of 'its lack of reasonably clear guidelines for law enforcement and its consequent encouragement of arbitrary and erratic arrests and prosecutions' ").

Despite these constructional principles, the Commonwealth's inability to find any supportive authority, and the central fact that neither the cement blocks nor the crane equipment ever physically touched any property indisputably possessed by the Schadys, the Commonwealth nonetheless argues (and the judge ruled) that a criminally punishable trespass occurred the instant the cement blocks or the crane mechanism crossed through the air above the driveway. Although unmentioned by the judge, the acceptance of this unprecedented and ultimately unpersuasive theory of criminal trespass would require the importation of the ancient civil trespass doctrine, "Cujus est solum, ejus est usque ad coelum" ("he who owns the soil owns upward unto heaven"), into the law of criminal trespass. Compare *Smith* v. *New England Aircraft Co.*, 270 Mass. 511, 529 (1930), and cases cited. But see *United States* v. *Causby*, 328 U.S. 256, 261 (1946) ("[T]hat doctrine has no place in the modern world"); Restatement (Second) of Torts, *supra* at § 159(1) comment g (that doctrine "can no longer be regarded as law, if it ever was"). There is no principled basis to do so here.

Where statutory language used to define a crime gives rise to an ambiguity, that language must, as noted, be strictly construed against the Commonwealth, with any plausible ambiguity being resolved in favor of the defendant. To the extent the meaning of "enter" in the statute is not unambiguously clear, we again adhere to this salutary canon. The statute specifically criminalizes two, and only two, disjunctive acts with respect to eight specific types of property: (1) entering in or upon such property after being forbidden to do so directly or by posted notice; or (2) physically remaining in or upon such property after being asked to vacate the premises. See *Commonwealth* v. *Richardson*, 313 Mass. 632, 638 (1943) ("[The statute's] only purpose is to protect the rights of those in lawful control of property to forbid entrance by those whom they are unwilling to receive, and to exclude them if, having entered, those in control see fit to command them to leave"). See also Nolan & Sartorio, Criminal Law § 410 (3d ed. 2001). The statute says nothing about airspace, or vicarious or constructive entry, or off-premises entry by means of an object thrown or lifted over any of the specified categories of property.

The judge recognized that neither the defendant nor her agent, the crane operator, had physically entered or touched the property indisputably possessed by the Schadys after being forbidden to do so or remained there after being asked to leave. Apparently applying the tort principles now relied on by the Commonwealth, but citing no authority, the judge nonetheless determined that he would credit the prosecution's theory that the defendant was guilty of a trespass whenever her agent steered the crane machinery or cement blocks through the air above the undisputed portion of the driveway.

It is not, however, our general practice to interject constructs of tort law when interpreting criminal statutes. It has only been within a limited area, when it is necessary to formulate duties in the criminal context, that our appellate courts have drawn on well-established duties imposed by civil law; but even then it has been done only when the existence of several critical factors indicated its propriety, particularly the presence of unreasonable risk to others. See *Commonwealth* v. *Welansky*, 316 Mass. 383, 397-401 (1944); *Commonwealth* v. *Twitchell*,

416 Mass. at 117-118; *Commonwealth* v. *Levesque*, 436 Mass. 443, 450 (2002) (all involving unreasonable risks resulting in death, leading to convictions for involuntary manslaughter). No such factors are present here.[5]

We reject the judge's unprecedented willingness to apply civil trespass law so as to criminalize harmless or equivocal conduct under G. L. c. 266, § 120, particularly in a situation that does not require or implicate the formulation of any duty. In the absence of any interference with, or danger to, the Schadys' use of their property flowing from the concrete blocks' brief aerial transit, this case furnishes no occasion on which to inject into our specific criminal trespass statute the notion that "a trespass may be committed . . . above the surface of the earth." Restatement (Second) of Torts, *supra* at § 159(1). In any event, "[w]e have no right to read into the . . . statute 'a provision [extending the definition of a statutory crime] which the Legislature did not see fit to put there.' " *Commonwealth* v. *Smith*, 46 Mass. App. Ct. 822, 826 (1999), *S.C.*, 431 Mass. 417, 425 (2000), quoting from *King* v. *Viscoloid Co.*, 219 Mass. 420, 425 (1914).[6]

With all due deference to art. 30 of the Massachusetts Declaration of Rights, we are constrained to comment on the regrettable and questionable expenditure of public funds that the

---

[5]The factors specifically to be considered in determining whether such a formulation is appropriate are whether (1) civil law creates a specific duty applicable to the criminal situation at bar; (2) other jurisdictions have recognized this particular civil principle as a basis for criminal liability; (3) our courts have previously expressed agreement with the underlying civil principle in a similar situation even if they did not explicitly adopt it; and (4) public policy requires the application of that civil principle to the criminal context in order to deter conduct creating unreasonable danger to others. See *Commonwealth* v. *Levesque*, 436 Mass. at 448-450, and cases cited. The Commonwealth fails to demonstrate how any these factors are implicated with respect to criminal trespass, thereby foreclosing our adoption of the tort principle.

[6]We note that it is not at all clear that the facts here presented would even give rise to an actionable tort under common-law principles. See *United Elec. Light Co.* v. *Deliso Constr. Co.*, 315 Mass. 313, 318-319 (1943) ("[A] defendant doing a lawful act upon his own premises cannot in the absence of negligence be held liable for injuries resulting to land of another . . . [except for acts] that constitute a nuisance to land of his neighbors"); *Edgarton* v. *H.P. Welch Co.*, 321 Mass. 603, 612 (1947) ("[A]n unintended intrusion upon the land in possession of another [without causing injury] does not constitute a trespass").

arguably arbitrary and erratic prosecution of this case involved. It seems clear that a more appropriate course for a dispute of this nature would have been a tort action, where equitable relief and the contempt sanction could adequately have remedied any ongoing, sustained, or repetitive injury to legitimate property rights. Conservation of our limited judicial and prosecutorial resources is an obligation that must be shared by all officers of the justice system and, as this case demonstrates, is one that needs reiteration.

*Judgment reversed.*

*Finding set aside.*

*Judgment for defendant.*